### Norfolk

GREGORY ORSON HETMEYER

v.

COMMONWEALTH OF VIRGINIA

No. 2315-92-1

Decided October 4, 1994

COUNSEL

Mitchell D. Broudy, for appellant.

Marla Lynn Graff, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

OPINION

**BRAY, J.**—Gregory Orson Hetmeyer (defendant) was convicted by a jury of possession of cocaine and heroin with the intent to distribute. On appeal, he complains that the trial court erroneously admitted evidence of a dog's response to currency discovered in defendant's motel room and challenges the sufficiency of the evidence to support the convictions. We find no error and affirm the convictions.

Under familiar principles of appellate review, we examine the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. *Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988). The jury's verdict will not be disturbed unless plainly wrong or without evidence to support it. *Id.* The credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination. *Long v. Commonwealth*, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989).

Similarly, in reviewing a trial court's ruling on a suppression motion, we consider the evidence in the "light most favorable to . . . the prevailing party below," the Commonwealth in this instance, and the decision of the trial judge will be disturbed only if plainly wrong. *Commonwealth v. Grimstead*, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). The record before us includes evidence adduced at both the trial and any suppression hearings. *DePriest v. Commonwealth*, 4 Va. App. 577, 583, 359 S.E.2d 540, 542-43 (1987), *cert. denied*, 488 U.S. 985 (1988). To prevail on appeal, the defendant must "show . . . that the denial of [his] motion . . . constitute[d] reversible error." *Motley v. Commonwealth*, 17 Va. App. 439, 440-41, 437 S.E.2d 232, 233 (1993).

While investigating illicit drug activity in the City of Virginia Beach, Detective Neal Thompson undertook surveillance of a local motel room. For several hours, no one was observed in or about the room, and Thompson, accompanied by Detective John Tosloskie and Thomas Sochor, an agent with the Immigration Service, decided to approach and knock at the door. In response, the closed curtains adjoining the door of the room "parted," defendant "looked out," and Thompson displayed his badge and identified himself as a police officer. "[H]olding the curtain open,"

defendant moved his hand rapidly "from the dead bolt to the handle . . . as if he was having a problem with the locks." Meanwhile, Thompson noticed two males "inside the motel room just running back and forth" and "around . . . one of the beds."

After several minutes, defendant opened the door and admitted the officers. Defendant acknowledged that he had engaged the room and produced identification which indicated that he resided in a neighboring city. Detective Thompson advised the three occupants that he was conducting a narcotics investigation, and each agreed to a search of the room.

On the "first bed," Thompson found a "bright yellow" AM/FM cassette player with seven "individual little plastic bags" and two "large chunks" of crack cocaine and ten "packets" of heroin hidden in its battery compartment. Without objection, Thompson, an "expert in the area of narcotics investigation distribution," testified that the cocaine was packaged in a manner and quantity indicative of distribution "on the street" and opined that the "large chunks of crack cocaine" were "not really something you'd try to sell on the street. It's just too much."[1] Thompson also noted that he had never seen anyone possess more than "[o]ne or two" packets of heroin "for themselves."

A suitcase was also resting on the bed and contained property belonging to all three men and a "bundle" of $2900. The money was separated into two $1,000 lots and one $900 lot and tightly bound with rubber bands. According to Thompson, this packaging was consistent with the "usual" practice of drug dealers. The suitcase also contained a "razor knife[,] which drug dealers use to cut up big chunks [of cocaine] . . . into smaller little rocks for sale," and an A.C. "adaptor" compatible with the cassette player. In addition, a "set of hand scales" and three digital pagers, all items Thompson related to drug distribution, were discovered in the room.

During questioning by Thompson, defendant described the suitcase as "mine," "everybody's," a "community type" bag and claimed "some property" found in the case, including approximately $1500 of the cash which he attributed to "savings."

---

[1] Thompson valued the packaged cocaine at $50 for each of the numerous rocks in the seven bags and $1400 for the two "chunks."

Defendant also claimed one of the pagers but denied knowledge of the drugs, stating that the cassette player was owned by "a guy[]" "not in the room," although he was unable to recall the man's name.

Thompson retained possession of the cash and, upon arrival at police headquarters, arranged with Officer George Ball, a "narcotics dog handler," to provide a "drug dog . . . to come up . . . to run on the money." Detective Tosloskie agreed to assist in this procedure and Thompson passed him the "bundle." Tosloskie, as instructed by Ball, obtained five new interdepartmental envelopes, "stuffed paper towels in four envelopes," placed the money in the fifth, and "laid them [all] in the hallway." Ball then entered the hall with his dog, Doc, who, after walking past "at least three of the envelopes[,] . . . immediately upon reaching the envelope with the money in it[,] . . . attacked it with his paws and . . . teeth."

Prior to trial, defendant moved the court to suppress the evidence of Doc's reaction at the currency "lineup." During the attendant hearing, Ball, an officer in the police K-9 Unit for over 24 years, testified that Doc was a "narcotics dog," certified by the Virginia State Police following extensive joint training with Ball in 1988 and recertified annually thereafter in the detection of cocaine, heroin, marijuana, and "derivative" odors. Additionally, Doc was trained monthly by Ball in the aromatic search of "various items" under diverse circumstances, and the two had investigated "over 447 cases" together. Ball could recall only a single "false alert" in the dog's history, and Doc had established a detection accuracy of ninety-five to ninety-eight percent.

Ball estimated that the "majority" of his actual investigations with Doc during recent years involved the examination of currency for suspect odors, or "currency runs." In such instances, Ball, as here, instructs persons assisting in the "run" to fill "at least four . . . envelopes" with "anything" to "make it look like it's U.S. currency" and a fifth envelope with the "contaminated currency." The envelopes are then placed "in the middle of the floor either in a line or a checkerboard pattern," and Doc is released in a "find mode." If he detects a targeted scent, Doc makes "a hit" and will "tear at the package."

Ball and Doc have been recognized as "expert witness[es] in narcotics detection" by both state and federal courts, including

courts of this Commonwealth. Without objection, Ball was offered and accepted by the trial court as an "expert in the area of dog handling and as a [sic] interpreter of his dog, Doc."

During argument in support of his motion to suppress, defendant complained that the reliability of the currency "lineup" was compromised because the "control" envelopes did not contain substances with odors like those commonly "used in making . . . cocaine"[2] and that evidence of the dog's response would "unduly prejudice" him. The trial judge concluded, however, that these considerations "go[] to the weight of the evidence, not as to [its] admissibility," and overruled defendant's motion.

## THE DOG

■ "It is well settled in Virginia that the opinion of an expert witness is admissible 'where the jury, . . . is confronted with issues' that 'cannot be determined intelligently merely from the deductions made and inferences drawn on the basis of ordinary knowledge, common sense, and practical experience . . . .'" *Schooler v. Commonwealth*, 14 Va. App. 418, 420, 417 S.E.2d 110, 111 (1992) (quoting *Compton v. Commonwealth*, 219 Va. 716, 726, 250 S.E.2d 749, 755-56 (1979)). The "expert's testimony is admissible not only when scientific knowledge is required, but when experience and observation in a special calling give the expert knowledge of a subject beyond . . . common intelligence and ordinary experience." *Hubbard v. Commonwealth*, 12 Va. App. 250, 254, 403 S.E.2d 708, 710 (1991), *aff'd*, 243 Va. 1, 413 S.E.2d 875 (1992) (quoting *Neblett, Adm'r v. Hunter*, 207 Va. 335, 339, 150 S.E.2d 115, 118 (1966)). Manifestly, a jury of lay persons required the assistance of an expert to properly interpret and give appropriate probative value to Doc's behavior in this instance.

■ It is equally "well established that the admissibility of expert testimony is within the sound discretion of the trial court, and that court's decision will not be disturbed absent an abuse of discretion." *Patterson v. Commonwealth*, 3 Va. App. 1, 11, 348 S.E.2d 285, 291 (1986). *See also Toro v. City of Norfolk*, 14 Va. App. 244, 252, 416 S.E.2d 29, 33 (1992). A challenge to an "ex-

---

[2] Additional circumstances suggesting unreliability of the Ball/Doc evidence discussed in the dissent were not argued by defendant at trial, on brief, or orally before this Court.

pert's . . . methods and determinations . . . , even by other experts, does not render inadmissible expert opinion based on those . . . methods and computations" but goes to the "weight of the evidence," raising "factual questions to be determined by the jury." *Hubbard*, 12 Va. App. at 255, 403 S.E.2d at 710.

A dog's response to particular stimuli and the interpretations of such response by an expert was approved by the Supreme Court as substantive evidence against an accused in *Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882 (1982).. There, as here, the witness qualified before the court as an expert in the "handling, and 'reading' " of dogs trained in the identification and detection of specific odors. *Id.* at 226, 294 S.E.2d at 889. He testified that the dog was exposed to Epperly's scent and subsequently led investigators along a "circuitous route" from the victim's abandoned vehicle to the door of Epperly's home. *Id.* at 226-27, 294 S.E.2d at 889. The Supreme Court reasoned that such

> evidence is admissible in a criminal case after a proper foundation has been laid to show that the handler was qualified to work with the dog and to interpret its responses, that the dog was a sufficiently trained and proven tracker of human scent, that the dog was placed on the trail where circumstances indicated that the guilty party had been, and that the trail had not become so stale or contaminated as to be beyond the dog's tracking capabilities.

*Id.* at 233, 294 S.E.2d at 893. The Court noted that "[t]he factors of staleness and contamination of the trail" were proper considerations for the jury "in connection with the weight to be given [the expert's] testimony."[3] *Id.*; *see also Price v. Commonwealth*, 18 Va. App. 760, 764, 446 S.E.2d 642, 645 (1994).

Just as the dog's "alert" on Epperly's scent and the related pursuit of it to his residence were admissible as substantive evidence in that prosecution, we hold that expert testimony with respect to a dog's reaction to the odor of narcotics is admissible when supported by a proper foundation. Such foundation must establish the appropriate training and reliability of the dog in the detection of

---

[3] Though apparently not an issue on appeal, there was also evidence in *Epperly* before the jury that the dog had identified the scent of the accused on one of six towels spread on the floor of an auditorium. *Epperly*, 224 Va. at 227, 294 S.E.2d at 889.

specific drugs by odor and the witness handler's expertise in interpreting the dog's behavior, together with circumstances conducive to a dependable scent identification by the animal and a credible evaluation of its related behavior.

Here, Officer Ball was qualified, without objection, as an expert in handling Doc and interpretation of his reactions. Evidence regarding Doc's certification, recertification, training regime, and near-perfect past performance was clearly sufficient to demonstrate the dog's high degree of reliability. Tosloskie and Thompson, the only two officers to handle the money after its seizure and prior to the "lineup," testified that the currency in issue did not come into contact with narcotics prior to Doc's "alert," and the evidence was uncontroverted that the "currency run" was conducted in accordance with procedures proven to produce accurate responses from the dog. Under such circumstances, the trial judge correctly ruled that defendant's challenges to the protocols of the "lineup" went "to the weight of the evidence, not as to [its] admissibility," and were appropriate factual considerations for the jury. Therefore, evidence of Doc's reaction to the currency and Ball's related interpretation was properly admitted into evidence.

However, even if otherwise admissible, defendant argues that the prejudicial effect of such evidence outweighed its probative value. This contention is also without merit.

> Evidence that tends to establish a fact at issue is relevant and material and, therefore, admissible, if its probative value is not outweighed by any prejudicial effect. . . . Once evidence is determined to be relevant and material, "[t]he responsibility for balancing . . . probative value and prejudice rests in the sound discretion of the trial court," and its decision "will not be disturbed on appeal in the absence of a clear abuse."

*Wilkins v. Commonwealth*, 18 Va. App. 293, 297-98, 443 S.E.2d 440, 443 (1994) (en banc) (citations omitted). Evidence of Doc's reaction to the currency permitted an inference that the money, portions of which belonged to defendant, had been in contact with the offending drugs. It thus connected defendant to the contraband and tended to establish his constructive possession of it, a fundamental element of the crimes in issue. The proof was, therefore, relevant, material, and highly probative and properly admit-

ted into evidence by the court.[4]

## SUFFICIENCY OF THE EVIDENCE

 Lastly, defendant contends that the evidence is insufficient to support his convictions. In order to convict defendant under the indictments, the prosecution was required to prove that he " 'intentionally and consciously possessed' the drug[s], either actually or constructively, with knowledge of [their] nature and character, together with the intent to distribute." *Wilkins*, 18 Va. App. at 298, 443 S.E.2d at 444 (citation omitted). "Constructive possession may be shown by defendant's acts, declarations or conduct which support the inference that the contraband was 'subject to his dominion or control,' " *id.* (citation omitted), and need not be exclusive. *Ritter v. Commonwealth*, 210 Va. 732, 741, 173 S.E.2d 799, 806 (1970); *Wymer v. Commonwealth*, 12 Va. App. 294, 300, 403 S.E.2d 702, 706 (1991). Defendant's intent to distribute the drugs may be " 'shown by circumstantial evidence' which is 'consistent with guilt' and 'inconsistent' with and 'exclude[s] every reasonable hypothesis of innocence.' " *Wilkins*, 18 Va. App. at 298, 443 S.E.2d at 444 (citation omitted).

Here, defendant deliberately delayed admitting the police officers to the motel room while other occupants were scurrying about inside. The ensuing investigation disclosed that defendant, a local resident, had engaged the room. Narcotics were discovered secreted in an AM/FM cassette player, packaged, and in quantities consistent with distribution. Near the player, a single suitcase contained an adaptor for the cassette player and property claimed by defendant, including a large sum of cash, bundled as customary in the drug trade and emitting an odor of illicit drugs. Additionally, paraphernalia commonly utilized in drug distribution was found in the room.

Although none of these circumstances, standing alone, would have sufficiently proved that defendant possessed the drugs, the facts combined to support the finding that the narcotics discovered

---

[4] " '[T]he court . . . is . . . always balancing the probative value of the evidence against the disadvantages (delay, confusion, prejudice, surprise, etc.) which may attend its admission. Each decision is made in light of the individual circumstances of the case, and the same evidence might well be admitted in one case and excluded in another because the balance struck between the factors is different in the two instances.' " *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 197, 361 S.E.2d 436, 441 (1987) (citation omitted).

were subject to defendant's informed "dominion and control." *See Hardy v. Commonwealth*, 17 Va. App. 677, 682-83, 440 S.E.2d 434, 437 (1994); *Johnson v. Commonwealth*, 12 Va. App. 150, 153, 402 S.E.2d 502, 504 (1991); *Josephs v. Commonwealth*, 10 Va. App. 87, 100, 390 S.E.2d 491, 498 (1990) (en banc). Further, this evidence sufficiently established that defendant constructively possessed the narcotics with the intent to distribute them. *See Servis v. Commonwealth*, 6 Va. App. 507, 524, 371 S.E.2d 156, 165 (1988); *Monroe v. Commonwealth*, 4 Va. App. 154, 156, 355 S.E.2d 336, 337 (1987); *Hambury v. Commonwealth*, 3 Va. App. 435, 438, 350 S.E.2d 524, 525 (1986).

Accordingly, we affirm the judgment of the trial court.

*Affirmed.*

Baker, J., concurred.

Benton, J., dissenting.

### I.

Over Hetmeyer's objection, the trial judge allowed the Commonwealth to introduce testimony that a police dog detected the odor of a narcotic emanating from a roll of money that included some of Hetmeyer's money. The majority concludes that the probative value of that identification outweighed its prejudicial value. I disagree with that conclusion.

Evidence is not admissible if it is irrelevant or its probative value is outweighed by its prejudicial value. *Boggs v. Commonwealth*, 199 Va. 478, 486, 100 S.E.2d 766, 772 (1957); *Lockhart v. Commonwealth*, 18 Va. App. 254, 259, 443 S.E.2d 428, 431 (1994). The Commonwealth has failed to establish that the testimony of a police dog's "alert" to the odor of a narcotic or its derivative on the roll of currency had any tendency to prove the fact for which it was offered.

The evidence proved that during Detective Thompson's search of the room, he opened the radio's battery compartment, where he discovered the bags of crack cocaine and heroin. After he closed the battery compartment, he continued to search and found a bundle of money in a suitcase. When the police were preparing to leave the room, Detective Thompson was assigned the task of delivering the radio and the money to police headquarters. For rea-

sons that are unexplained on the record, he placed the money in his coat pocket. No evidence proved that Detective Thompson enclosed the money in a wrapper before inserting it in his pocket.

The evidence proved that a police dog later "alerted" to the money Detective Thompson seized from the room and placed in his pocket. The evidence did not prove whether the dog "alerted" to cocaine, heroin, marijuana, or one of the other "derivative" odors which the dog was trained to identify. No evidence suggested that the dog alerted in a unique manner for each narcotic or that residue of a particular narcotic was discovered on the money.

In attempting to establish that Hetmeyer possessed the narcotics, Detective Thompson "speculate[d] [that] somebody handled the money after handling the drugs." However, Thompson's testimony established that he could have been the source of the transfer of a narcotic to the money. His search progressed from the narcotics to the money. Moreover, Thompson did not place the money in a bag or other container before he placed it in his pocket.

The evidence also failed to prove that the money which the dog identified as having the odor of narcotics was in fact Hetmeyer's money. Hetmeyer claimed only $1500 of the $2900 discovered in the suitcase and later exposed to the dog. One of the other men claimed some of the money. Although the third man did not claim that any of the money belonged to him, he, as did Hetmeyer and the second man, claimed ownership of some of the clothing in the suitcase where the money was found. Simply put, no evidence proved that Hetmeyer was the only person who touched the money and was the source of the contamination.

Significantly, no testimony proved what quantity of narcotic was required in order to be detectable by the dog or whether the presence of detectable quantities of narcotic on currency was a common or uncommon occurrence. The dog's handler acknowledged, however, that in order to train the dog to distinguish between "clean" and drug-tainted currency, he taught the dog to distinguish between uncirculated currency obtained from a bank and currency known to have been near narcotics. Because of the widespread exposure of much of U.S. currency to narcotics, a dog's successful identification of "tainted" currency is of little, if

any, evidentiary significance. *See United States v. Fifty-three Thousand Eighty-two Dollars in United States Currency*, 985 F.2d 245, 250 n.5 (6th Cir. 1993) (noting that evidentiary value of drug detecting dog's alert has been called into question in light of large amount of currency tainted with drugs); *Jones v. United States Drug Enforcement Administration*, 819 F. Supp. 698, 720 (M.D. Tenn. 1993) (noting that DEA chemist found that one-third of bills in randomly selected sample were contaminated with detectable cocaine and that Federal Reserve Bank money sorting belts were also contaminated).

In order for the dog's alert to the money to have been probative of any fact in this case, the jury must necessarily have speculated that the odor detected by the dog was either cocaine or heroin, that the odor was not marijuana, that money with such an odor is uncommon, that Hetmeyer's money was the money that contained the odor of narcotic, and that Hetmeyer's money came to have such an odor by virtue of Hetmeyer's possession of narcotics. That speculation is unwarranted by the evidence and is too attenuated to be of any probative value. Furthermore, these circumstances manifestly establish that the prejudice that flows from allowing proof of the dog's identification of the odor of narcotics on the money outweighs its probative value.

In relying on *Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882 (1982), for the proposition that the dog's identification was properly admitted, the majority misinterprets the import of that case. In *Epperly*, a dog was used to follow the scent of a human.

> We hold that dog-tracking evidence is admissible in a criminal case after a proper foundation has been laid to show that the handler was qualified to work with the dog and to interpret its responses, that the dog was a sufficiently trained and proven tracker of human scent, *that the dog was placed on the trail where circumstances indicated that the guilty party had been, and that the trail had not become so stale or contaminated as to be beyond the dog's tracking capabilities.*

224 Va. at 233, 294 S.E.2d at 893 (emphasis added).

In *Epperly*, the dog followed a scent it had first detected from an article of clothing known to belong to Epperly. *Id.* at 227, 294 S.E.2d at 889. In this case, although there was proof that Hetmeyer had been standing near the suitcase that contained his currency, no evidence proved that the narcotic scent the dog detected was related to Hetmeyer and not someone else. Given the nature of the scent that the dog in this case was tracking (i.e., marijuana, heroin, cocaine, or a derivative odor), it cannot be said as was the case in *Epperly*, that "[i]n the actual event[] the dog unerringly followed the trail . . . to the defendant's front door." *Id.* at 233, 294 S.E.2d at 893.

For all of these reasons, evidence of the dog's identification of Hetmeyer's currency should have been suppressed.

## II.

The majority also concludes that the circumstances of Hetmeyer's presence in a hotel room were sufficient to prove that he exercised dominion and control over narcotics found in the hotel room. I also disagree that the evidence was sufficient to prove that Hetmeyer possessed either the heroin or cocaine.

Because no evidence proved that Hetmeyer was ever in actual possession of either drug, the sole question is whether Hetmeyer constructively possessed heroin or cocaine. His proximity to those items, even in a hotel room that he rented, is insufficient to prove beyond a reasonable doubt that he possessed them. *See Clodfelter v. Commonwealth*, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977). In order to prove that Hetmeyer constructively possessed contraband, the Commonwealth was required to prove facts and circumstances that indicated that Hetmeyer was aware of its presence and exercised dominion and control over the contraband. *Drew v. Commonwealth*, 230 Va. 471, 473, 338 S.E.2d 844, 845 (1986). Moreover, in order for circumstantial evidence to prove guilt beyond a reasonable doubt, it must be wholly consistent with guilt and wholly inconsistent with innocence. *Bishop v. Commonwealth*, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984).

The police found bags of heroin and cocaine in the battery compartment of a radio on a bed in the hotel room which Hetmeyer rented. Two other men were also present in the hotel room. No evidence proved that Hetmeyer was aware of the drugs in the

radio. Although the police dog may have "alerted" to a roll of money, some of which Hetmeyer admitted was his, no evidence proved that Hetmeyer's money was connected with the contraband found in the radio or that the odor the dog detected was in fact that of heroin or cocaine.

The majority also states that Hetmeyer delayed in admitting the investigating police officers into the hotel room. The detective who initially approached Hetmeyer's hotel room testified, however, that after he knocked at the hotel room door Hetmeyer came to the door and "[s]tarted to go from the dead bolt to the handle like this [indicated]; . . . and . . . was going up and down as if he was having a problem with the locks. . . . [H]e kept doing this [indicating] for a while just back and forth, back and forth up to the dead bolt and down, and finally he opened the door." Nothing in the detective's testimony proved that Hetmeyer was not having trouble with the locks. The detective also testified that the delay was "[o]ne or two minutes. Wasn't very long."

Moreover, Hetmeyer was under no obligation to admit the detective who came to the door without a warrant and who admitted that during his hour-long surveillance of the room from the outside he saw nothing suspicious. Neither the Commonwealth nor the majority cite any authority for the proposition that such a delay as was present here is evidence of consciousness of guilt or any other inculpatory circumstance. *Cf. Clodfelter*, 218 Va. at 623, 238 S.E.2d at 822 (reversing conviction notwithstanding fact that defendant gave false identity to police who searched hotel room with valid search warrant).

Although the radio containing the narcotics was found near a suitcase that contained some personal property of Hetmeyer's, no evidence proved that Hetmeyer owned the radio. Indeed, Hetmeyer told the police that he did not own the radio and that the radio was owned by a fourth person. Even if the jury believed that Hetmeyer lied to the police, a finding the jury could not have made based on Hetmeyer's lack of credibility since he did not testify, Hetmeyer's lying about ownership of the radio does not permit the attenuated inference that Hetmeyer knew of the drugs in the radio and intended to possess them. Hetmeyer, for example, may have lied to protect his two companions or because he believed the radio to be stolen or because he suspected that it might, in some way, implicate one of his companions. Any inference that

Hetmeyer lied to conceal his guilt, as opposed to some other inference consistent with innocence, is necessarily speculative. *See, e.g.,* *Bishop*, 227 Va. at 170, 313 S.E.2d at 393 (characterizing defendant's deceit as "suspicious conduct which does not constitute evidence sufficient to support a finding of guilt beyond a reasonable doubt"); *Stover v. Commonwealth*, 222 Va. 618, 624, 283 S.E.2d 194, 196-97 (1981) (defendant's possible perjury regarding a suspicious circumstance was insufficient to prove guilt beyond a reasonable doubt); *Hyde v. Commonwealth*, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977) ("suspicious inferences" may be drawn from defendant's deceptive conduct, but these are insufficient to prove guilt beyond a reasonable doubt). Of course, Hetmeyer's silence at trial is not a factor upon which the jury could choose to credit a particular inference. *See Durant v. Commonwealth*, 7 Va. App. 454, 458, 375 S.E.2d 396, 398 (1988).

Similarly, evidence that a scale, razor knife, and an AC adaptor for the radio were found in the suitcase does not prove that Hetmeyer possessed drugs. Each of those items was lawfully possessed. No evidence established that narcotics or narcotics residue were found on those items. Furthermore, the items were in a suitcase which contained property claimed by Hetmeyer and one of the other men. None of those items was in plain view inside the room. Hetmeyer told Detective Thompson that the suitcase "was a community type suitcase, that everybody had some property that was in the suitcase." Indeed, when Detective Thompson spoke to the other occupants of the room, they all claimed some property in the suitcase.

Detective Thompson stated that the knife found in Hetmeyer's suitcase was the sort used to cut crack cocaine. No evidence proved that the knife contained cocaine or its residue or that a person might not have such a knife for an alternative reason.

The presence of digital pagers in the room as well as Hetmeyer's possession of a large sum of cash do not prove that Hetmeyer possessed the narcotics. The detective testified that the manner in which Hetmeyer carried his money was consistent with the method used by drug dealers. The money was not found on Hetmeyer's person, however. Although the manner in which the money was rolled may be consistent with the method of drug dealers, no evidence proved that only drug dealers are known to carry their money tightly rolled.

Because the evidence in this case was wholly circumstantial and because it did not exclude all reasonable hypotheses of innocence, the evidence was insufficient to prove Hetmeyer's guilt beyond a reasonable doubt.